IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JUDY PAYTON,

     Plaintiff,

v.                      No. 13-1215

STANFILL, INC., *et al.,*

     Defendants.

_____

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION*

The Plaintiff, Judy Payton, brought this action on July 23, 2013 against the Defendants,

Stanfill, Inc. d/b/a Stanfill Sonics ("Stanfill Sonics"); Jerry Stanfill; Beverly Stanfill and Kenny

Reed, alleging violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e,

*et seq.*; Section 610 of the Consolidated Omnibus Budget Reconciliation Act, as amended, 29 U.S.C.

§ 1161, *et seq.* and the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-101, *et seq.*

("THRA"). She also alleged claims under Tennessee common law. Before the Court is the motion

of Defendants Stanfill Sonics, Jerry Stanfill and Beverly Stanfill[1] for partial summary judgment,

pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to Plaintiff's claims of sexual

harassment (Count I) and retaliation (Count II) under Title VII; sexual harassment (Count IV) and

retaliatory discharge (Count V) under the THRA; and intentional infliction of emotional distress

(Count VI), negligent infliction of emotional distress (Count VII) and negligent supervision and

_____

[1]Reed has since been dismissed as a defendant in this case.

retention (Count VIII) under state law. Defendants also seek dismissal of Count IX of the complaint, which alleges an age discrimination claim.

*STANDARD OF REVIEW*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court is to "view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Marie v. Am. Red Cross*, 771 F.3d 344, 351 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The burden is initially on the moving party to inform the district court of the basis of its motion, and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks & alterations omitted). "The moving party may make this showing by demonstrating the absence of evidence to support one of the essential elements of the nonmoving party's claim." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322-25). The nonmoving party then "bears the burden of producing in turn evidence which would support a jury verdict." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)) (internal quotation marks omitted). "[I]f the nonmoving party is unable to present sufficient evidence to permit a reasonable jury to find in its favor, summary judgment is appropriate." *Hyland v. HomeServs. of Am., Inc.*, 771 F.3d 310, 316 (6th Cir. 2014).

*FACTS*

Following are the material facts of this case viewed in the light most favorable to the

Plaintiff. Stanfill Sonics owns and operates multiple drive-in restaurant franchises in Tennessee. According to her declaration, Beverly Stanfill is the company's sole owner and chief executive officer and Jerry Stanfill is its chief operating officer. On or about July 8, 1997, she hired Payton to work as her administrative assistant. During 2011 and 2012, Plaintiff held the position of office manager, with her primary job duties involving payroll. At that time, Plaintiff worked at the corporate office located at 2811 North Highland Avenue in Jackson, Tennessee. She was not involved in the human resources department and investigation of sexual harassment allegations was not part of her job duties.

Sometime in 2010 or 2011, Jerry Stanfill, James Brandon, then director of operations David Williams, Kevin Carter and company bookkeeper Lloyd Russell were in the same area of the office when Brandon presented Payton with a sealed pack of business cards. Mr. Stanfill commented that, if she wore short skirts and "sucked dick," she could make $100,000 a year. (D.E. 42-3 at 8.) It is unclear what the cards said. She recalled that the whole office was talking about the incident and some "ribbed" her about it.

Plaintiff testified in her deposition that, in February of 2010 or 2011 -- she thought it was 2010 because he left the company in 2011 -- Williams made a comment about Payton's pants as he walked through the office conference room where she was getting coffee. He asked if they were velvet and if he could touch them. When she said he could not and walked past him, he reached through her legs from behind and grabbed her crotch. In her affidavit, she stated the incident occurred in December 2010 or early January 2011.

Reed began his employment with Stanfill Sonics in October 2006 and, in 2011, became director of operations, working out of the company's corporate office. He was not Plaintiff's

supervisor.  In her affidavit, Payton related that he told her he liked it when she wore her long hair down on at least seven occasions from 2011 to 2012.[2]  In approximately three of those instances, beginning as early as 2012, he told her the hairstyle turned him on, while giving her a sideways "half-hug."  In her deposition, she testified that she was friendly with Reed, joked around with him and, when asked if she ever hugged him, responded "Probably, maybe, I don't know."  (D.E. 42-3 at 32-33.)  She further testified that she never told Reed to stop the "half-hugs" and, later in her deposition, that she could not recall telling him not to hug her.  In an affidavit attached to her responsive brief, Payton averred that "I told Reed I was offended when he put his arm around me and when he would make comments about my hair."[3]  (D.E. 43-2 ¶ 14.)

On one day in April 2012, Plaintiff alleged that Reed made three comments she considered to be offensive:  he could only have "straight sex" with his wife, he wanted to "stick a Hall's mentholated cough drop up [Payton's] pussy and eat it out" and there was enough room in the bathroom for him and Plaintiff.  (D.E. 43-2 ¶ 16.)  The statements were made in the hallway outside several offices and a conference room in the presence of Brandon and Russell.  She could not recall how the conversation started and said she might have "walked in on it" or "walked through."  (D.E. 42-3 at 17.)  She turned around, entered her office and shut the door.  She described the bathroom comment as "somewhat" offensive.  (*Id.* at 22.)

In July 2012, she claimed that Reed told her during a smoke break on the office patio that he had a photograph of an employee's vagina on his cell phone and shoved it toward her face.  She

---

[2]In her deposition she remembered it as between five and ten.

[3]Her response to Defendants' statement of facts on this point also cited generally to her deposition.  The Local Rules of this district provide, however, that "[e]ach disputed fact must be supported by *specific* citation to the record."  LR 56.1(b).

pushed the phone away. Also present were Jerry Stanfill, Brandon and Russell. When she got up to leave, Plaintiff alleged that Mr. Stanfill asked Reed to send the photograph to his phone.

Although Payton maintained that Beverly Stanfill was absent from the office for months at a time, it is undisputed that the two were friends and that Plaintiff had Ms. Stanfill's cellphone number. Nonetheless, Plaintiff stated in her deposition that the first complaint she made to the Stanfills about Reed's behavior was to Beverly Stanfill on October 1, 2012 in the company's conference room, several months after the incidents occurred. (D.E. 43-3 at 45-46.) She also testified that she complained of harassment in meetings with the Stanfills on October 31, 2012 and the date of her termination -- November 5, 2012. In her affidavit, however, she asserted that she reported Reed's April 2012 comments to Ms. Stanfill in person prior to July 2012.

In September 2012, Payton introduced her boyfriend, now husband, Shawn Andrews, to Jerry Stanfill. Plaintiff maintains that Mr. Stanfill knew prior to meeting Andrews that he was on a sex-offender registry in Florida but had been removed from a similar list in Tennessee. According to the Defendants, Payton failed to disclose that Andrews was her boyfriend or that he was on any sex-offender registry. He was hired as a manager-in-training on or about October 1, 2012. On October 26, 2012, Andrews was terminated for unsatisfactory performance due to numerous complaints of sexual harassment, his arrest at the drive-in location where he worked, and his sex-offender status.

The Stanfills met with Plaintiff on November 5, 2012 to advise her that her employment was being terminated. Payton filed a charge with the Equal Employment Opportunity Commission and the Tennessee Human Rights Commission on November 19, 2012.

*ASSERTIONS OF THE PARTIES AND ANALYSIS*

*Sexual Harassment (Hostile Work Environment)*

With respect to her sexual harassment claims, Payton has alleged that she was subjected to a hostile work environment. Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . ." 42 U.S.C. § 2000e-2(a)(1). The THRA likewise prohibits discrimination on the basis of sex in connection with one's employment. Tenn. Code Ann. § 4-21-101(a)(3). The prohibition against discrimination on the basis of sex has been extended to proscription of a hostile work environment. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2440-41 (2013). Hostile work environment claims under the state statute are analyzed under the same rubric as those brought pursuant to Title VII. *Bailey v. USF Holland, Inc.*, 526 U.S. 880, 885 n.1 (6th Cir. 2008).

To prevail on such a claim, a plaintiff must demonstrate that "(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on sex, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the employer is liable for the harassment." *Blackmon v. Eaton Corp.*, 587 F. App'x 925, 930 (6th Cir. 2014) (citing *Williams v. CSX Transp. Co., Inc.,* 643 F.3d 502, 511 (6th Cir. 2011)) (internal quotation marks omitted). The parties' assertions focus on the fourth element, which the Court finds the Plaintiff has failed to establish. Thus, it need not address the remaining prongs.

A court's determination in connection with the fourth factor "is not susceptible to a mathematically precise test." *Id.* at 930-31. Rather, courts are to consider a range of factors,

6

"including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009)) (internal quotation marks omitted).  The harassing conduct "must be extreme to amount to a change in the terms and conditions of employment." *Nicholson v. City of Clarksville, Tenn.*, 530 F. App'x 434, 442 (6th Cir. 2013).  "[C]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 (6th Cir. 2012) (quoting *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993)), *reh'g & reh'g en banc denied* (Apr. 11, 2012).  "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* (quoting *Harris*, 510 U.S. at 21-22).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 708 (6th Cir. 2012).  Nor will the "sporadic use of abusive language, gender-related jokes, and occasional teasing." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  To interfere with an employee's work performance, the harassment must "ma[k]e it more difficult to do the job." *Snyder v. Pierre's French Ice Cream Co.*, 589 F. App'x 767, 773 (6th Cir. 2014).

"The issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether -- taken together -- the reported

incidents make out such a case." *Blackmon*, 587 F. App'x at 931 (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999)); *see also Stevens v. St. Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 629-30 (6th Cir. 2013) (in determining whether a work environment is hostile, courts in this circuit consider the totality of the circumstances). The court is to consider "harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment." *Williams v. CSX Transp. Co., Inc.*, 533 F. App'x 637, 641 (6th Cir. 2013) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d at 562). Courts are cautioned, however, that "Title VII is not a general civility code for the American workplace." *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000) (quoting *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998)) (internal quotation marks omitted). The statute is "not designed to purge the workplace of vulgarity." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997).

Although Defendants contend that the Court should not consider actions that occurred prior to those involving Reed, even considering the business card and crotch-grabbing incidents, the Plaintiff has failed to establish that she was subjected to a hostile work environment. "While there is no bright line rule as to what constitutes a hostile work environment, the plaintiff's allegations must depict conduct that could be construed as pervasive enough to alter the conditions of her employment and to create an abusive situation." *Clark*, 400 F.3d at 351. "Summary judgment is improper if plaintiff advances evidence of harassment that is 'ongoing,' 'commonplace,' and 'continuing.'" *Berryman*, 669 F.3d at 717 (internal quotation marks omitted).

The comments complained of by Plaintiff, while offensive, were not threatening or particularly serious. Instead, they fall into the category of "mere offensive utterances." *See Reed v. Proctor & Gamble Mfg. Co.*, 556 F. App'x 421, 433 (6th Cir.) (comments regarding fried chicken

and watermelon, while offensive to black employee, were not threatening or serious, and, thus, fell under umbrella of mere "offensive utterances"), *cert. denied*, 135 S. Ct. 84 (2014). Further, three of the comments occurred on the same day. *See Williams v. CSX Transp. Co., Inc.*, 643 F.3d at 513 (fact that several comments were made over a two-day period militated against finding of pervasive hostile work environment).

These comments, along with the remaining events -- the business card incident, crotch-grabbing, sideways half-hugs and the vagina photo -- over a two-year period fall short of establishing a hostile work environment under the law of this Circuit. The following cases are illustrative. In *Blackmon*, a manager stared at the plaintiff's breasts "each and every time he was near her" between three and ten times per week and rubbed her back and breathed on her neck "often" when he approached her in her work area. *Blackmon*, 587 F. App'x at 927. His attentions caused her to dress differently and be constantly on her guard lest he be nearby. *Id.* at 927, 931. On these facts, because plaintiff "suffered a continual barrage of offensive stares and touches for the ten months she worked under" the harasser, the defendant's motion for summary judgment was denied. *Id.* at 931.

In *Clark*, plaintiff Rhonda Knoop alleged that, over a two-and-a-half-year period, a male supervisor told sexual jokes in front of her at least once a month; twice walked past her in the hallway, placed his vibrating pager against her upper thigh and asked her if it "felt good"; and grabbed the back of her overalls as if to look down them when she told him she was wearing a thong underneath. *Clark*, 400 F.3d at 344-45, 352. The court found summary judgment appropriate, as her "claims depict[ed] isolated instances rather than an ongoing situation." *Id.* at 351-52. In doing so, the Sixth Circuit likened her allegations to those presented in *Stacy v. Shoney's, Inc.*, No. 97-

5393, 1998 WL 165139 (6th Cir. Mar. 31, 1998) (per curiam). *Clark*, 400 F.3d at 352. In *Stacy*, the plaintiff, a hostess at a Shoney's restaurant, alleged that her manager leered at her, called her at home to say that he missed her, touched her breast when he removed and replaced a pen from her front shirt pocket, and told her he liked it when she wore her hair down and that, if he had someone like her at home, he would not let them leave the house. *Stacy*, 1998 WL 165139, at *1. The court found the supervisor's conduct, while offensive, "not sufficiently frequent, severe, physically threatening, or humiliating to unreasonably interfere with [p]laintiff's work performance to constitute actionable work place harassment." *Id.* at *3.

In contrast, the *Clark* court concluded that summary judgment was not warranted as to a co-worker/plaintiff, Sandra Clark. *Clark*, 400 F.3d at 352. Clark presented seventeen incidents of harassment by the same harasser over the same time period, including encouraging her to take a chip from a bag he held in front of his crotch during a company luncheon, telling her she "did a good job in [his] dream last night," showing her an email apparently depicting "two cartoons screwing," suggesting they conduct a business meeting in a storage closet, brushing his shoulder against hers, scratching a wall partition where Clark's breasts were located on the other side in front of her female supervisor, whispering to her that he was jealous of her conversation with the same female supervisor about a shipment of cherries, tossing a vibrating pager into her lap and asking if it felt good while discussing a work-related matter in her cubicle, placing the vibrating pager on her waist/thigh area on another occasion as he passed her in the hall, and leering at her while she stood at a printer, stating that he was enjoying the view. *Id.* at 345. On several occasions as she was leaving work, he would hold out his hand as if to give her a "high-five" and sometimes grab her palm and scratch it with his finger. Once, she tried to pull her hand away and he grabbed her arm

instead, twisted it, and again scratched her palm. *Id.* Although Clark's allegations were "similar in kind" to Knoop's, the court found that she "present[ed] more of an ongoing pattern of unwanted conduct and attention" by the harasser. *Id.* at 352. Thus, hers was a "closer case" that should not be disposed of by summary judgment. *Id.*

In *Howington v. Quality Restaurant Concepts, LLC*, 298 F. App'x 436 (6th Cir. 2008), the Sixth Circuit found an ongoing pattern of unwanted conduct similar to that experienced by Clark, citing evidence that the plaintiff's harasser asked her for sex every day she worked with him, asked to perform oral sex on her at an after-work outing, frequently yelled at her in front of customers, slammed a door in her face, texted her multiple times threatening to fire her if she refused to have sex with him and disciplined her twice. *Howington*, 298 F. App'x at 444-45. Citing *Clark* and *Stacy*, the court found the facts before it equated more with the allegations of Clark than Knoop and denied summary judgment. *Id.*

The plaintiff in *Stevens* presented evidence that her harasser closed an office door at times and said he loved her, put his arms around her and kissed her, and that she sometimes hid from him in the bathroom. *Stevens*, 533 F. App'x at 630. These statements of affection and physical contact were "clearly inappropriate" and "unwanted." *Id.* Nonetheless, the Sixth Circuit concluded that "the working environment was not permeated with discriminatory intimidation or ridicule, nor was it physically threatening such that it would have unreasonably interfered with [plaintiff's] work performance." *Id.*

In *Burnett*, in a six-month period, the plaintiff's manager entered the room where a meeting was being held and began telling a story about a woman he had seen. *Burnett*, 203 F.3d at 981. While doing so, he placed a pack of cigarettes containing a lighter inside Burnett's tank top and bra

strap. *Id.* Two weeks later at another meeting, the plaintiff coughed and the manager gave her a cough drop, stating, "Since you have lost your cherry, here's one to replace the one you lost." *Id.* Some five months thereafter, Burnett wore a Christmas sweater to work on which was printed, "Deck the Malls." *Id.* The manager walked past her and said, "Dick the malls, dick the malls, I almost got aroused." *Id.* The court found that, even though the cigarette incident could have been considered a battery, a single battery coupled with two merely offensive remarks did not a hostile environment make. *Id.* at 984-85.

While the behavior of some of Stanfill Sonics' male employees was unquestionably boorish, it did not, in the Court's view, rise to the level of ongoing, pervasive and severe activity found by the Sixth Circuit to create a hostile work environment. Nor is there evidence that the alleged harassment interfered with Payton's work performance. Summary judgment is, therefore, GRANTED on the Plaintiff's claims of hostile work environment under federal and state law.

*Retaliation*

Title VII prohibits discrimination against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The THRA also proscribes retaliation against employees who have opposed discriminatory practices or who have made a charge of discrimination. Tenn. Code Ann. § 4-21-301(a)(1). Plaintiff's claims arise from the statutes' "opposition" clauses.

Absent direct evidence of retaliation, the familiar *McDonnell Douglas* paradigm is applied to claims based on circumstantial evidence. *Samuels v. Corr. Med. Servs., Inc.*, ___ F. App'x ___, 2015 WL 327615, at *8 (6th Cir. Jan. 26, 2015). "To establish a prima facie case of retaliation, [a

plaintiff] must demonstrate: (1) that she engaged in a protected activity; (2) that [her employer] had knowledge of her protected conduct; (3) that [her employer] took an adverse employment action against her; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Id.* Retaliation claims "must be proved according to traditional principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Weeks v. Mich., Dep't of Cmty. Health*, 587 F. App'x 850, 858 (6th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)) (internal quotation marks omitted).

If Payton offers sufficient evidence to support a prima facie case of retaliation, the burden of production shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for her termination. *See Samuels*, 2015 WL 327615, at *8. Plaintiff must then show that the stated reason was merely a pretext for retaliation. *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 501 (6th Cir. 2013). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Samuels*, 2015 WL 327615, at *8 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008)). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally retaliated against her." *Morris v. Dep't of Veterans Affairs*, ___ F. App'x ___, 2015 WL 263979, at *4 (6th Cir. Jan. 21, 2015). The court must "bear in mind that pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 508 (6th Cir. 2014) (internal quotation marks omitted), *reh'g en banc denied*

(Aug. 13, 2014).  The burden of persuasion in the *McDonnell Douglas* analysis always remains with the plaintiff.  *Samuels*, 2015 WL 327615, at *8.  The same analysis is applied to retaliation claims under Tennessee law.  *Willoughby v. Allstate Ins. Co.*, 104 F. App'x 528, 530 n.2 (6th Cir. 2004).

The Defendants take issue only with the fourth element of the prima facie case -- causation.[4] In response to the dispositive motion, Payton points to her deposition testimony, to-wit:

> Q:    Did Beverly tell you that you were being terminated because of your complaints of sexual harassment involving Kenny Reed?
>
> A:    She told me I was on a witch hunt after Kenny Reed.
>
> Q:    Did she tell you you were being terminated for --
>
> A:    No, let me rephrase that.  Jerry said I was on a witch hunt after --
>
> Q:    Did Beverly tell you -- did Beverly tell you you were being terminated because of your complaint of -- your complaints of sexual harassment against Kenny Reed?
>
> A:    No.  She used the term witch hunt.
>
> Q:    Okay.  Did Jerry tell you that he -- that you were being terminated because of your complaints of sexual harassment involving Kenny Reed?
>
> A:    He said that I was making up things against Kenny Reed and I was on a witch hunt is why I was being terminated.
>
> Q:    Okay.  Did Jerry say you were making up sexual harassment complaints about Kenny Reed?
>
> A:    No, he didn't.  They didn't address the sexual harassment complaint.
>
> Q:    Then what were they --
>
> A:    They said I was making up things.

---

[4] An employee's complaints of inappropriate behavior in the form of sexual harassment qualify as "protected conduct" under Title VII.  *Mys v. Mich. Dep't of State Police*, ___ F. App'x ___, 2014 WL 5394084, at *8 (6th Cir. Oct. 23, 2014).

Q: Okay. Then what did Jerry tell you you were making up about Kenny Reed?

A: That's what he said, you are on a witch hunt against Kenny Reed. You are fabricating, you are making up things. He didn't elaborate on them.

Q: Okay. Well, what do you think they were taking [sic] about then?

A: I can't testify to what I think they thought. You would have to talk to them.

Q: They just called you in and told you you were being fired because you were on a witch hunt?

A: Yes.

Q: There was no other detail on that meeting they offered you?

A: No, there were more details.

Q: Okay. Well, give me those other details.

A: Basically the gist of it was that. . . . I was on a witch hunt after Kenny.

(D.E. 43-3 at 47-48, D.E. 42-3 at 42.) In her deposition, she also related that, about a week after the crotch-grabbing incident, Beverly Stanfill called a meeting in Jerry's office. The attendees included Payton, Williams and Russell. Williams stood[5] and conducted the meeting, in which he told Plaintiff she had been very "unwelcoming" to him.[6] (D.E. 43-3 at 21.) Plaintiff viewed the meeting as retaliation for her complaint about Williams' behavior. She also refers to the deposition testimony of Russell, in which he stated that he had been told by the Stanfills that Payton was terminated

[5]Plaintiff averred in her additional statement of facts that, during this meeting, Beverly Stanfill permitted Williams to "stand over" her, citing to pages forty-three and fifty-six of her deposition. The testimony on the former merely indicates that Williams stood during the meeting and the latter page was not provided to the Court.

[6]Payton was not the only subject of the meeting, however. She and Russell were criticized for not taking Williams' phone calls. As a result, the caller identification feature was removed from their office telephones. In her affidavit, Plaintiff stated that Williams told them they both were ignoring and being unwelcoming to him.

because she was talking to other employees about alleged sexual harassment by Reed.

The Defendants argue that the temporal proximity between the complaint of harassment and the termination alone is not sufficient to establish causation. In doing so, they ignore the evidence cited to by Payton, which, viewed in the light most favorable to her, creates a genuine issue of material fact as to the causation element of the prima facie case.

The burden of production now shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. It is their position that she was discharged for a "loss of trust" by Beverly Stanfill based on multiple incidents. Plaintiff's lies, false and malicious accusations against other employees and interference with operations, Defendants submit, led to her firing. Specifically, the movants point to the following occurrences that prompted her discharge:[7] (1) Beverly Stanfill lost trust in Plaintiff after Andrews was hired and terminated; (2) Jody Pierce told Ms. Stanfill that Payton said Reed was a snake in the grass and a two-faced liar, warned him that Reed was out to get him, and that she would ruin the company; (3) Ms. Stanfill believed, after receiving reports from two managers, that Payton revealed confidential information about manager Eric Cagle to Andrews; (4) former employee Will Riddle told Ms. Stanfill that Payton called him when Plaintiff told Stanfill that Riddle initiated contact with her; and (5) before informing Ms. Stanfill of a report of sexual harassment of manager Kerry Simmons by Reed, Plaintiff called Simmons first and delayed reporting it to Stanfill when it was not Payton's job to investigate sexual harassment claims. Plaintiff must at this juncture demonstrate that the proffered reasons were pretext for retaliation.

---

[7]Although other incidents are discussed in the briefs, these are the reasons set forth in Defendants' brief as the reasons for Payton's discharge. Accordingly, they will receive the attention of the Court.

<u>Proffered Reason No. 1.</u>

Payton avers that Andrews was initially introduced to Jerry Stanfill at a restaurant.  During their conversation, Mr. Stanfill decided that Andrews would be an asset to the company and expressed his interest in interviewing him.  Andrews had a second interview, at which Plaintiff introduced him to Beverly Stanfill.  She stated to Ms. Stanfill that she did not understand why the company was conducting a second interview because Mr. Stanfill hired her boyfriend after the first interview.  Ms. Stanfill asserted in her declaration that Payton first advised her the two were dating after Andrews was hired.  Stanfill testified as follows in her deposition:

A:      First off she told me that Jerry hired this guy that she introduced me to that was coming for an interview, and me trusting Judy, I thought, well, there had to be some confusion because it would not make sense.  So I got him interviewed and texted Jerry to see if he'd hired him, and he said, no, but we -- you know, trusting Judy I allowed that to happen.  She did not report to me at that time that he was her boyfriend.

Q:      Okay.  So if someone --

A:      She did not report to me --

Q:      . . .  Did you discharge her because she didn't reveal to you that she had a boyfriend?

A:      That set up the scenario for many things.

Q:      Was that a part of the reason why you discharged her, that she had a boyfriend and she didn't tell you about it?

A:      It is not that simple.

Q:      It has to be -- there are questions here.  Did it have anything to do with her --

A:      Withholding information would.

Q:      So it was a part of it.  The reason -- part of the reason --

A:     It breaks our trust.

Q:     -- is it true the reason part of the reason to discharge her was that she didn't reveal to you that she had a boyfriend?  Is that part of the reason why you discharged her, or part of the reason to set up the reason why you discharged her?

A:     Not telling me pertinent information that would be --

Q:     What other pertinent information.  She had a boyfriend, she didn't tell you that.  What other pertinent information did she not tell you?

A:     She told me her boyfriend had already been hired.  She did not tell me he was her boyfriend, and she did not clue me on that he was on a sex offender list.

Q:     Okay.  You fired her because she didn't tell you that he was on a sex offender list?

A:     No.

Q:     Did you fire her because he didn't -- because she said that she thought he was hired when he wasn't hired, and --

A:     It started to break my trust in Judy.  I fired her for lack of trust any more.

                              *       *       *

A:     She did withhold information, which I told you on the front end.

Q:     What did she withhold?

A:     The fact that she did have a relationship with this man.  The fact that on he was on a sex offender list, and then she made a false statement when she said Jerry had already hired him.

Q:     That was what she thought.  That's what her understanding was, right?  That's not a false statement when that's what you understand; is that right?

A:     No.  That's a false statement.  She has a way of manipulating things to get things.  And I know that, and I don't -- that one little thing would be okay, that's one little thing, but it continued.

Q:     Well, that's one little thing that she didn't reveal to you, who her boyfriend -- that she had a boyfriend, that he was a sex offender on a sex offender list, and

that she thought that her boyfriend had been hired by Jerry. Jerry said he wasn't, and you fired her over that; is that correct? That was a falsehood? That's a falsehood that she thought Jerry had hired him, and Jerry said he didn't, and she -- that's a falsehood?

A:    He didn't get hired that day, so, no.

(D.E. 42-2 at 21-23, 27-28.)

Proffered Reason No. 2.

According to Beverly Stanfill, between October 24, 2012 and Payton's termination, Jody

Pierce reported to her that Plaintiff told him that Reed was a snake in the grass and a two-faced liar.

The following testimony was adduced in Ms. Stanfill's deposition:

Q:    Now, did she [Plaintiff] interfere with -- did she interfere with Jody Pierce's performance of her[8] operations, et cetera?

A:    I think so.

Q:    She did how?

A:    Well, he reported to me that he felt that she was setting him up because she knew he liked Kenny, and was trying to get him to say things against Kenny.

Q:    Okay. And when did she tell you that? When did he tell you that?

A:    Somewhere in October.

Q:    October, before Judy was terminated?

A:    Yes.

Q:    You had a meeting with -- you had a meeting with Jody?

A:    The whole month of October we had lots of discussions.

Q:    And you had a meeting, did you not, with Mr. Pierce?

---

[8]Jody Pierce is a man. Apparently, the use of the term "her" was in error.

A:     Several meetings with Mr. Pierce.

Q:     Tell me about the -- tell me about the last meeting you had with Mr. Pierce before she was terminated.

A:     The last meeting with Mr. Pierce. Jody told me that Judy had -- well, Judy was out at the store to do files. He said every time she walked by me she made statements against Kenny, and she was talking to the employees, and I thought she was trying to set me up, to be honest. And let me think.

                    *        *        *

A:     He also said that she asked him if there was complaints about Kerry Simmons. That his -- this lady came in the meeting where Kerry Simmons had fired someone and asked for a meeting with whoever she needed to, and Judy said -- he said that Judy said it was Kenny Reed that -- she said, well, she's got sexual harassment charges against Kenny Reed, according to Julie Pierce (as stated)[9], and he said I told Judy that my sister's bad to lie.

                    *        *        *

Q:     Was that -- was that the meeting when he said that -- that Judy was calling him a liar and a snake in the grass?

A:     Uh-huh.

Q:     That was the same meeting?

A:     I'm not sure.

Q:     That he was trying to get him fired -- get her fired, et cetera?

A:     She said that if anybody tries to cost me my job I will ruin them and this company.

                    *        *        *

A:     She was on a campaign of vindictiveness because she felt that [Reed]

---

[9]The Court assumes that the parenthetical "as stated" indicates that the deponent indeed said "Julie Pierce." Considering that in the same sentence Ms. Stanfill recalled a statement by Jody Pierce that he told Payton his "sister[] was bad to lie," the Court further assumes Julie Pierce is Jody Pierce's sibling.

had wrongfully done her boyfriend [sic].

Q:    Now, is it against your company policy for an employee to bad mouth a manager?

A:    When you have an employee for 16 years that's in your office that continually is bringing many things, complaints about the same person; and they'd always loved the person until their boyfriend was hired and dismissed. I find that it is a problem when it would cause destructive attitudes undermining his authority speaking to his subordinates about him in a foul way, which he had no proof of.

Q:    What complaints did she bring?

A:    Judy was out talking to Jody, anybody that would listen; Jimmy Sullock, Josh Mitchell, numerous employees. . . . She told Jody to watch his back, that [Reed] was a two face liar, that he was out to get her, he would not take the hits, that he had tried to cost her her job.

*          *          *

A:    She said that Kenny is trying to cost her her job. She told me Kenny said he wanted to put a cough drop or whatever -- something about the payroll and Judy's boyfriend, dah, dah. Judge, jury and executioner. Got mad at me, dah, dah, dah.

(*Id.* at 10-12, 29-30.) Despite the Defendants' position that Payton had it in for Reed because he was responsible for Andrews' discharge, Ms. Stanfill testified in her deposition that "it was after her boyfriend was *hired*, she began to second guess and condemn everything that was going on." (*Id.* at 19 (emphasis added).)

In her affidavit, Payton denied Ms. Stanfill's allegations, stating that she "did not engage in a campaign against Reed other than opposing sexual harassment of myself and other employees." (D.E. 43-2 ¶ 24.) Mr. Pierce testified in his deposition that Judy never told him Reed was a two-faced liar or a snake in the grass. Rather, Reed told him to make Plaintiff look bad in a meeting with Beverly Stanfill on October 23 or 24, 2012. Specifically, Reed instructed Mr. Pierce to tell Ms.

Stanfill that Payton called Reed a two-faced liar and a snake.  Reed also said to mention "judge, jury, and executioner."  (D.E. 43-5 at 34.)  When asked if Reed told him he would be fired if he refused, Pierce replied, "Not in so many words."  (*Id.* at 29.)  He added that "[a]ll of this, honestly, was made up by me to make Judy look bad to save my job."  (*Id.* at 31.)  According to Pierce, Payton never interfered with any store manager.  Ms. Stanfill related in her deposition that Payton told her at the time that the statements made to her by Pierce were false.

Proffered Reason No. 3.

The Defendants claim that, after Andrews was hired, Payton reported that store manager Eric Cagle was having a sexual relationship with an underage carhop.  In her affidavit, Plaintiff insisted that it was Russell who reported the relationship to Reed.  An internal investigation ensued.  Beverly Stanfill claimed she believed Plaintiff told Andrews about the investigation because he texted a female employee that Cagle was going to lose his job.  Payton insisted that Andrews did not send the text message, even though two managers told Ms. Stanfill they personally observed it.  Ms. Stanfill testified in her deposition concerning the incident as follows:

A:    [Andrews] was at the South Highland location.  He would not know anybody was investigating anything if it wasn't for Judy.

Q:    You don't know that Judy told him anything.  You have no proof of that, do you?

A:    She said she didn't, but there's --

Q:    That's right.  She said that she didn't, and you still fired her, and you had no proof of that.

A:    That wasn't the --

Q:    I've got to hear something about why you fired her, because I haven't gotten a reason yet.

22

A: I fired her for disrupting our entire business by --

*  *  *

Q: . . . Be specific, just name one thing that she breached confidentiality over.

A: When she allowed [Andrews] to know what was going on inside the office.

Q: But you have no -- you have no proof that she told [Andrews] anything, did you?

A: She did that, and --

Q: Wait a minute. She said that she didn't do that. Did you have any proof that she did?

A: How else would he know it?

Q: I don't know. Just, if Eric Cagle was going to get fired the employees could have said that. Other managers could have said it, a thousand people could have said that. It wasn't necessarily that Judy said it?

A: In all probability it would have come from inside the office.

Q: All probability, okay. You fired her on a probability, okay.

A: It was one of many reasons.

(D.E. 43-6 at 13; 17.)

Proffered Reason No. 4.

The vagina in the photograph on Reed's phone apparently belonged to Stanfill Sonics employee Joy Riddle. Her husband Will also worked for the company. According to Payton, she discovered from Mr. Riddle, around the end of October 2012 and after Andrews' termination, that he left the Defendants' employ because Reed "was terrorizing and holding the thing about having sex with Joy over him." (D.E. 42-3 at 39-40.) In her declaration, Beverly Stanfill related that, during a meeting on or about October 29, 2012, Payton "stated that former employee Will Riddle

contacted [her] out of the blue with concerns about Reed."  (D.E. 42-7 ¶ 19.)  Ms. Stanfill went on

to assert that she "investigated Payton's allegation involving Will Riddle by calling Mr. Riddle.  Mr.

Riddle stated that Payton had initiated contact with him by calling him."  (*Id.* ¶ 20.)  In her

deposition, Ms. Stanfill added that Mr. Riddle told her he called Plaintiff back.  "Irregardless," Ms.

Stanfill testified, "that was not her job."  (D.E. 42-2 at 15.)  What was not her job, the Defendants

argue, was the investigation of sexual harassment by Reed.

Proffered Reason No. 5.

     Defendants aver that, prior to informing Beverly Stanfill of a report of sexual harassment by

Kerry Simmons against Reed, Plaintiff called Simmons first and delayed reporting it to Ms. Stanfill

when it was not Payton's job to investigate sexual harassment claims.  The following testimony was

adduced at Ms. Stanfill's deposition:

> Q:    Okay.  Regarding the Kerry Simmons situation, do you know why Kerry --
> do you know why Judy Payton went to see Kerry Simmons about her sexual
> harassment complaint?
>
> A:    I didn't know she went to see her.
>
> Q:    Did you know -- did you investigate and ask why?
>
> A:    I didn't know she did it.
>
> Q:    You didn't know that she talked to Kerry Simmons.
>
> A:    I know she called her.
>
> Q:    When she called her, do you know why she called her.
>
> A:    I know what she told me later.
>
> Q:    What did she tell you?
>
> A:    To ask if she had one.

Q:      Did she not tell you that an employee and her mother came in to see Kenny Reed, and Kenny was not in, and the mother said I don't want my daughter to meet with Kenny Reed because my daughter has said to me that he's sexually harassing Kerry Simmons?

A:      No. That is not what she said to me.

Q:      What did she say?

A:      When I said why did you call her, she said to see if there was one because a girl that Kerry Simmons fired, her and her mother came in --

Q:      Okay.

A:      -- and said she wanted to talk to somebody about getting her daughter's job back, and she said that said, well, that would be Kenny Reed, and he isn't here right now. And she said Kenny Reed -- Kerry Simmons, of course, of whom she was mad at, is why she was there, I heard has sexual harassment charges on him. So Judy told me she called Kerry to find out, when I quizzed her, because she knew that Kenny would be blindsided by this lady's statements if he didn't know anything about it.

Q:      And did you fire Judy because of that?

A:      No, not just that.

Q:      But that was part of it.

A:      She shouldn't have called Kerry Simmons. She should have called me and told me.

(D.E. 42-2 at 31-32.) According to her affidavit, Payton attempted to report Simmons' sexual harassment complaint against Reed to Beverly Stanfill, but she did not answer her phone.[10] The company's policy directed employees to bring complaints of sexual harassment to the franchise owner (presumably Ms. Stanfill), Kayla Stanfill, Mr. Pierce or Reed. When asked in her deposition

---

[10]In her response to the Defendants' statement of facts, Plaintiff asserted that she and Russell attempted to call Ms. Stanfill to make this report, referring only to paragraph twenty-five of Payton's affidavit. (*See* D.E. 43-1 at 12.) The cited paragraph makes no mention whatever of Russell.

whether it was a company policy that an employee could not ask another employee whether she was sexually harassed, Ms. Stanfill replied in the negative.

The evidence referenced with respect to Defendants' proffered reasons for the discharge, as well as the proof cited by the Plaintiff in support of the causation prong of the prima facie case, constitutes a question of fact that is not well suited for summary disposition. *See Philbrick v. Holder*, 583 F. App'x 478, 490 (6th Cir. 2014) (recognizing "overlap between the causal connection requirement and a showing that the proffered reason for termination was not the actual reason and . . . that, in retaliation cases, the same type of evidence may be used to prove both"). Specifically, most of the Defendants' proffered reasons deal with sexual misconduct by Reed of Payton and others and, therefore, could tend to support the Plaintiff's position.

In their reply brief, the Defendants argue that their proffered reason with respect to Payton's alleged disclosure of confidential information to Andrews was not pretextual because Beverly Stanfill had a reasonable belief that such disclosure had been made. The Court assumes Defendants are invoking the honest belief rule. The rule "means that a dispute over the facts upon which the discharge was based will not suffice to establish pretext if the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Blackmon*, 587 F. App'x at 932 (internal citation & quotation marks omitted). "The employer's decision-making process need not be optimal, nor leave no stone unturned; rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Weaver v. City of Twinsburg, Ohio*, 580 F. App'x 386, 393 (6th Cir. 2014) (internal quotation marks & alterations omitted).

Notes on the investigation into the Andrews incident, apparently prepared by Mr. Pierce,

stated that "[t]he information that [Cagle] was even in trouble could only have come from [Payton], as she works in the office and would be privy to this information. Since [Payton] and [Andrews] are dating I can only assume she was trying to give him knowledge of information within the company to help him get his own store." (D.E. 42-10 at 2.) However, Ms. Stanfill testified in her deposition that, in documents submitted to the Tennessee Department of Unemployment Security, the Defendants identified the reason for Plaintiff's termination as interfering with store managers in carrying out their duties and with matters outside her job duties. Viewing the evidence in the light most favorable to the Plaintiff, a reasonable finder of fact could conclude that the Defendants' failure to mention Payton's alleged disclosure of confidential company information -- a serious charge indeed -- to the state agency as the reason for her termination could suggest that it was not the real reason for her discharge.

A reasonable jury could also conclude that the remaining reasons -- Payton's failure to tell Beverly Stanfill that Andrews was her boyfriend, telling her he had already been hired prior to his second interview, and telling Ms. Stanfill that Mr. Riddle called her when it was the other way around -- could reasonably be found by a finder of fact to be insufficient to warrant discharge. The Defendants' motion for summary judgment on the Plaintiff's retaliation claims under Title VII and the THRA is DENIED.

*Individual Liability*

The Defendants seek summary judgment on claims of individual liability under Title VII and the THRA on the part of Beverly and Jerry Stanfill. However, the Plaintiff did not address the issue in her response. Nor did she mention it in her sur-reply. Accordingly, the Court is left to assume that the claim has been abandoned. To the extent Payton has asserted a claim of individual liability

against these two Defendants in this case, it is DISMISSED.

*Age Discrimination*

Claims for age discrimination under federal law are governed by the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"). The statute prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, the THRA protects citizens from discrimination because of age in connection with employment. Tenn. Code Ann. § 4-21-101(a)(3).

Defendants first seek summary judgment on the ADEA claim on failure to exhaust grounds. "Because administrative exhaustion does not raise a jurisdictional question under the ADEA, however, [the court] may decline to decide the issue [of exhaustion] if reaching the merits of [the plaintiff's] claim provides a clearer basis for the disposition of the case." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 403 (6th Cir. 2008). As such is the case here, the Court will turn its focus to the merits of Payton's claims of age discrimination.

In the absence of direct evidence of discrimination, the ADEA plaintiff must establish, in accordance with *McDonnell Douglas*, a prima facie case by offering evidence "(1) that [she] is a member of a protected class; (2) that [she] was subject to an adverse employment action; (3) that [she] was otherwise qualified for the position [she] held; and (4) that [she] was replaced by a younger employee outside of the protected class." *Mayhue v. Cherry Street Servs., Inc.*, ___ F. App'x ___, 2015 WL 349026, at *9 (6th Cir. Jan. 27, 2015). Upon a showing of the prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the termination, which the plaintiff must establish was a pretext for age discrimination. *Id.* at *11. Age discrimination

claims brought under the THRA are analyzed using the same evidentiary framework applicable to ADEA claims. *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 n.2 (6th Cir. 2014).

The nature of Plaintiff's age discrimination claim is somewhat unclear. According to her deposition, the basis for the claim is that she was replaced by Kayla Stanfill, Jerry and Beverly Stanfill's daughter. In her complaint, the only allegation contained in Count IX, the age discrimination count, stated that "[a] similarly situated office worker at Stanfill, Inc. under the age of twenty five (25) was compensated over twice the amount Plaintiff was compensated on a yearly basis." (D.E. 1 ¶ 87.) In any case, even if she demonstrated a prima facie case of age discrimination, she has offered no evidence whatsoever that her discharge was motivated by discriminatory animus toward older employees. Accordingly, summary judgment is GRANTED as to her age discrimination claims. *See Mayhue*, 2015 WL 349026, at *11 (even if plaintiff could establish prima facie case of discrimination, he failed to establish that elimination of his position was pretext for unlawful animus toward older workers).

### Negligence

Defendants seek summary judgment on Plaintiff's claims of negligent retention and negligent infliction of emotional distress, brought under state law, on the grounds that they are preempted by the Tennessee Workers' Compensation Act (the "TWCA"). The statute provides in pertinent part that "[t]he rights and remedies granted to an employee subject to this chapter, on account of personal injury or death by accident . . . shall exclude all other rights and remedies of the employee, . . . at common law or otherwise, on account of the injury or death." Tenn. Code Ann. § 50-6-108(a). The Defendants' argument is correct. *See Giles v. Hometown Folks, LLC*, ___ F. Supp. 3d ___, 2014 WL 5169669, at *7 (E.D. Tenn. Oct. 14, 2014) (in case alleging employment discrimination and

retaliation, plaintiff's claim under state law for negligent infliction of emotional distress was barred by the exclusive remedy of the TWCA); *Bellomy v. Autozone, Inc.*, No. E2009-00351-COA-R3-CV, 2009 WL 4059158, at *11 (Tenn. Ct. App. Nov. 24, 2009) (plaintiff's claims of negligent infliction of emotional distress and negligent retention barred by TWCA). Summary judgment on Plaintiff's negligence claims is GRANTED.

*Intentional Infliction of Emotional Distress*

A cause of action for intentional infliction of emotional distress in Tennessee has three elements: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of results in serious mental injury." *DeSoto v. Bd. of Parks & Recreation*, ___ F. Supp. 3d ___, 2014 WL 6680681, at *18 (M.D. Tenn. Nov. 25, 2014) (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Tennessee has adopted a "high threshold standard" for tortious conduct actionable as an intentional infliction of emotional distress claim. *Id.* In *Bain*, the Tennessee Supreme Court explained that

> [t]he cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Bain*, 936 S.W.2d at 623. "In applying this standard, Tennessee courts have indicated that trial courts should be wary of permitting [intentional infliction of emotional distress] claims to move

30

forward in employment discrimination cases, absent exceptional allegations." *DeSoto*, 2014 WL 6680681, at *19. "[E]ven where courts permit claims of harassment or retaliation to proceed under state and federal statutes, courts will not permit [such] claims to proceed in most employment discrimination cases; this approach applies even where a defendant or its employees engaged in highly reprehensible conduct or otherwise intended to cause the plaintiff to suffer emotional distress." *Id.* Actions that may be illegal are not necessarily "atrocious" or "utterly intolerable in a civilized community." *Id.*

A serious or severe mental injury "occurs when a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Am. Nat'l Prop. & Cas. Co. v. Stutte*, No. 3:11-CV-219, 2015 WL 268994, at *5 (E.D. Tenn. Jan. 21, 2015) (quoting *Brown v. Mapco Express Co.*, 393 S.W.3d 696, 705 (Tenn. Ct. App. 2012)). "'Unable to cope with the mental stress engendered' means that the plaintiff has demonstrated, by means of certain factors or other pertinent evidence, that he or she has suffered significant impairment in his or her daily life resulting from the defendant's extreme and outrageous conduct." *Giles*, 2014 WL 5169669, at *7. Such factors include:

    (1)    Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;

    (2)    Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;

    (3)    Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;

(4)     Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;

(5)     Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and

(6)     In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

*Id.* (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 209-10 (Tenn. 2012)).

In her deposition, Payton testified that she had migraine headaches for which she took medication "[f]rom probably 2010 to -- or 2009 until '12." (D.E. 43-3 at 49.) She did not take the medication on a daily basis, but only when she had a migraine. She related that she took nerve pills for anxiety or depression beginning prior to 2009 "because there was always issues going -- I started taking them at some time during my employment with Stanfill." (*Id.* at 53.) Plaintiff stated that she was also prescribed medication for "blood pressure because [she] believe[d] that went back to all of the yelling and screaming and stuff in the office." (*Id.* at 52.) At the time of her deposition, she no longer needed the medication. Payton recalled that, as a result of the alleged harassment and retaliation, she was depressed, although she was never diagnosed as such because, she claimed, she "did not have insurance to go to the doctor to do that." (*Id.* at 56.) She reported no other ill effects and denied seeking treatment from a mental health professional.[11]

Plaintiff insists in her response to the dispositive motion that the harassment began in 2010. According to her deposition, this was *after* she began taking medication for anxiety and depression. The migraine headaches are problematic for the same reason. She recalled in her deposition that

---

[11]She did, however, testify that she suffered from mitral valve prolapse, for which she took no medication. Plaintiff did not indicate that this condition had any relation to the allegations in this case.

they could have started as early as 2009, which was prior to the alleged harassment. Although it is unclear exactly when Payton was prescribed blood pressure medication, it appears from her deposition testimony that this too began prior to 2010. Moreover, she has not alleged "yelling and screaming" as a basis for any of her claims in this case. Thus, the Court is unconvinced that any blood pressure issues arising in or after 2010 were related to alleged sexual harassment or retaliation. Thus, the record does little to support a showing that her physiological or psychological problems resulted from the conduct of which she complains. Based on the evidence before it, the Court cannot find that Payton has made a showing sufficient to establish that she suffered serious mental injury. Summary judgment on the intentional infliction of emotional distress claim is GRANTED.

*CONCLUSION*

For the reasons articulated herein, the motion for summary judgment is DENIED as to the Plaintiff's retaliation claims under federal and state law and GRANTED as to the remainder.

IT IS SO ORDERED this 23rd day of February 2015.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE